**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GREATER BALTIMORE CENTER FOR
PREGNANCY CONCERNS,
INCORPORATED,

*Plaintiff-Appellee,*

and

ST. BRIGID'S ROMAN CATHOLIC
CONGREGATION INCORPORATED;
ARCHBISHOP EDWIN F. O'BRIEN,
ARCHBISHOP OF BALTIMORE AND HIS
SUCCESSORS IN OFFICE, A
CORPORATION SOLE,

*Plaintiffs,*

v.

MAYOR AND CITY COUNCIL OF
BALTIMORE; STEPHANIE RAWLINGS-
BLAKE, Mayor of Baltimore, in her
Official Capacity; OXIRIS BARBOT,
Baltimore City Health
Commissioner,

*Defendants-Appellants,*

and

No. 11-1111

OLIVIA FARROW; BALTIMORE CITY
HEALTH DEPARTMENT,

     *Defendants.*

TAUNYA LOVELL BANKS, Jacob A.
France Professor of Equality
Jurisprudence, University of
Maryland School of Law; C.
CHRISTOPHER BROWN, Jacob A.
France Professor of Equality
Jurisprudence, University of
Maryland School of Law; ERWIN
CHEMERINSKY, Jacob A. France
Professor of Equality
Jurisprudence, University of
Maryland School of Law; ROBERT
J. CONDLIN, Jacob A. France
Professor of Equality
Jurisprudence, University of
Maryland School of Law; NORMAN
DORSEN, Jacob A. France Professor
of Equality Jurisprudence,
University of Maryland School of
Law; LEIGH GOODMARK, Jacob A.
France Professor of Equality
Jurisprudence, University of
Maryland School of Law; STEVEN
P. GROSSMAN, Jacob A. France
Professor of Equality

Jurisprudence, University of Maryland School of Law; MARTIN GUGGENHEIM, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; DEBORAH HELLMAN, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; MARGARET E. JOHNSON, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; KENNETH LASSON, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; SYLVIA A. LAW, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; SUSAN PAULA LEVITON, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; AUDREY MCFARLANE, Jacob A. France Professor of Equality

Jurisprudence, University of Maryland School of Law; PAULA A. MONOPOLI, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; BURT NEUBORNE, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; JOHN T. NOCKLEBY, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; HELEN L. NORTON, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; DAVID A. J. RICHARDS, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; ELIZABETH J. SAMUELS, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; ELIZABETH M. SCHNEIDER, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; JANA B. SINGER, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of

Law; BARBARA ANN WHITE, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; TOBIAS BARRINGTON WOLFF, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; DIANE L. ZIMMERMAN, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION; AMERICAN MEDICAL WOMEN'S ASSOCIATION; ROBERT BLUM; WILLARD CATES, JR.; CHESAPEAKE REGIONAL CHAPTER OF THE SOCIETY FOR ADOLESCENT HEALTH AND MEDICINE; ERIC LEVEY; MATERNAL AND CHILD HEALH ACCESS; NADINE PEACOCK; PHYSICIANS FOR REPRODUCTIVE CHOICE AND HEALTH; MARK SEIGEL; LAURIE SCHWAB ZABIN; CATHOLICS FOR CHOICE; DC ABORTION FUND; DIANA DEGETTE; DONNA EDWARDS; LAW STUDENTS FOR REPRODUCTIVE JUSTICE; CAROLYN MALONEY; MARYLAND CHAPTER FOR THE NATIONAL ORGANIZATION FOR WOMEN; NARAL PRO-CHOICE AMERICA; NARAL PRO-CHOICE MARYLAND; NATIONAL ABORTION FEDERATION;

NATIONAL ADVOCATES FOR
PREGNANT WOMEN; NATIONAL
ASIAN PACIFIC AMERICAN WOMEN'S
FORUM; PLANNED PARENTHOOD OF
MARYLAND; MIKE QUIGLEY;
RELIGIOUS COALITION FOR
REPRODUCTIVE CHOICE; SISTERSONG
WOMEN OF COLOR REPRODUCTIVE
JUSTICE COLLECTIVE; LOUISE
SLAUGHTER; JACKIE SPEIER; WHOLE
WOMAN'S HEALTH OF BALTIMORE;
WOMEN'S LAW CENTER OF
MARYLAND, INCORPORATED; HUMAN
RIGHTS WATCH; SUSAN DELLER
ROSS, Professor,

            *Amici Supporting Appellant,*

PREGNANCY CARE ORGANIZATIONS
CARE NET; HEARTBEAT
INTERNATIONAL, INCORPORATED;
NATIONAL INSTITUTE OF FAMILY AND
LIFE ADVOCATES; ROCKA-MY-BABY
PREGNANCY CRISIS CENTER; BOWIE
CROFTON PREGNANCY CLINIC,
INCORPORATED; CARE NET
PREGNANCY CENTER OF FREDERICK;
CARE NET PREGNANCY CENTER OF
SOUTHERN MARYLAND; LAUREL
PREGNANCY CENTER; ROCKVILLE
PREGNANCY CENTER, INCORPORATED;
AMERICAN CENTER FOR LAW AND
JUSTICE; AMERICAN ASSOCIATION OF
PRO-LIFE OBSTETRICIANS AND
GYNECOLOGISTS;

CHRISTIAN MEDICAL & DENTAL
ASSOCIATIONS; CATHOLIC MEDICAL
ASSOCIATION; HELEN M. ALVARE,
Associate Professor of Law,
George Mason University School
of Law; ROBERT JOHN ARAUJO, S.J.,
John Courtney Murray, S.J.
University Professor, Loyola
University of Chicago School of
Law; ROBERT F. COCHRAN, JR.,
Louis D. Brandeis Professor of
Law, Pepperdine University
School of Law; DAVID DEWOLF,
Professor, Gonzaga University
School of Law; DWIGHT G.
DUNCAN, Professor of Law,
University of Massachusetts
Dartmouth School of Law; JOHN
C. EASTMAN, Henry Salvatori
Professor of Law & Community
Service, former Dean, Chapman
University School of Law; SCOTT
T. FITZGIBBON, Professor, Boston
College Law School; RICHARD W.
GARNETT, Associate Dean and
Professor of Law, Notre Dame
Law School; BRADLEY P. JACOB,
Associate Professor,

Regent University School of Law; DREW L. KERSHEN, Earl Sneed Centennial Professor of Law, University of Oklahoma College of Law; LYNNE MARIE KOHM, John Brown McCarty Professor of Family Law, Regent University School of Law; RICHARD S. MYERS, Professor of Law, Ave Maria School of Law; MICHAEL STOKES PAULSEN, Distinguished University Chair and Professor, University of St. Thomas School of Law; ROBERT J. PUSHAW, James Wilson Endowed Professor of Law, Pepperdine University School of Law; MICHAEL SCAPERLANDA, Professor of Law, Gene & Elaine Edwards Family Chair in Law, The University of Oklahoma College of Law; GREGORY C. SISK, Pio Cardinal Laghi Distinguished Chair in Law and Professor, University of St. Thomas School of Law; O. CARTER SNEAD, Professor of Law, Notre Dame Law School; RICHARD STITH, Professor of Law, Valparaiso University School of Law; TIMOTHY J. TRACEY, Assistant Professor of Law, Ave Maria School of Law;

LYNN D. WARDLE, Bruce C. Hafen
Professor of Law, J. Reuben Clark
Law School, Brigham Young
University,

      *Amici Supporting Appellee.*

---

ST. BRIGID'S ROMAN CATHOLIC
CONGREGATION INCORPORATED;
ARCHBISHOP EDWIN F. O'BRIEN,
ARCHBISHOP OF BALTIMORE AND HIS
SUCCESSORS IN OFFICE, A
CORPORATION SOLE,

      *Plaintiffs-Appellants,*

      and

GREATER BALTIMORE CENTER FOR
PREGNANCY CONCERNS,
INCORPORATED,

      *Plaintiff,*

      v.

MAYOR AND CITY COUNCIL OF
BALTIMORE; STEPHANIE RAWLINGS-
BLAKE, Mayor of Baltimore, in her
Official Capacity; OXIRIS BARBOT,
Baltimore City Health
Commissioner,

      *Defendants-Appellees,*

      and

No. 11-1885

OLIVIA FARROW; BALTIMORE CITY
HEALTH DEPARTMENT,

*Defendants.*

HELEN M. ALVARE, Associate
Professor of Law, George Mason
University School of Law;
AMERICAN CENTER FOR LAW AND
JUSTICE; AMERICAN ASSOCIATION OF
PRO - LIFE OBSTETRICIANS AND
GYNECOLOGISTS; ROBERT JOHN
ARAUJO, S.J., John Courtney
Murray, S.J. University Professor,
Loyola University of Chicago
School of Law; BOWIE CROFTON
PREGNANCY CLINIC, INCORPORATED;
CARE NET PREGNANCY CENTER OF
FREDERICK; CARE NET PREGNANCY
CENTER OF SOUTHERN MARYLAND;
CHRISTIAN MEDICAL & DENTAL
ASSOCIATIONS; CATHOLIC MEDICAL
ASSOCIATION; ROBERT F. COCHRAN,
JR., Louis D. Brandeis Professor
of Law, Pepperdine University
School of Law; DAVID DEWOLF,
Professor, Gonzaga University
School of Law; DWIGHT G.
DUNCAN, Professor of Law,
University of Massachusetts
Dartmouth School of Law;

JOHN C. EASTMAN, Henry Salvatori Professor of Law & Community Service, former Dean, Chapman University School of Law; SCOTT T. FITZGIBBON, Professor, Boston College Law School; RICHARD W. GARNETT, Associate Dean and Professor of Law, Notre Dame Law School; HEARTBEAT INTERNATIONAL, INCORPORATED; BRADLEY P. JACOB, Associate Professor, Regent University School of Law; DREW L. KERSHEN, Earl Sneed Centennial Professor of Law, University of Oklahoma College of Law; LYNNE MARIE KOHM, John Brown McCarty Professor of Family Law, Regent University School of Law; LAUREL PREGNANCY CENTER; RICHARD S. MYERS, PROFESSOR OF LAW, AVE MARIA SCHOOL OF LAW; NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES; MICHAEL STOKES PAULSEN, Distinguished University Chair and Professor, University of St. Thomas School of Law; PREGNANCY CARE ORGANIZATIONS CARE NET; ROBERT J. PUSHAW, James Wilson Endowed Professor of Law, Pepperdine University School of Law;

ROCKA-MY-BABY PREGNANCY CRISIS CENTER; ROCKVILLE PREGNANCY CENTER, INCORPORATED; MICHAEL SCAPERLANDA, Professor of Law, Gene & Elaine Edwards Family Chair in Law, The University of Oklahoma College of Law; GREGORY C. SISK, Pio Cardinal Laghi Distinguished Chair in Law and Professor, University of St. Thomas School of Law; O. CARTER SNEAD, Professor of Law, Notre Dame Law School; RICHARD STITH, Professor of Law, Valparaiso University School of Law; TIMOTHY J. TRACEY, Assistant Professor of Law, Ave Maria School of Law; LYNN D. WARDLE, Bruce C. Hafen Professor of Law, J. Reuben Clark Law School, Brigham Young University,

*Amici Supporting Appellant,*

TAUNYA LOVELL BANKS, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; C. CHRISTOPHER BROWN, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; ERWIN CHEMERINSKY, Jacob A. France Professor of Equality Jurisprudence, University of

Maryland School of Law; ROBERT J. CONDLIN, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; NORMAN DORSEN, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; LEIGH GOODMARK, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; STEVEN P. GROSSMAN, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; MARTIN GUGGENHEIM, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; DEBORAH HELLMAN, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; MARGARET E. JOHNSON, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; KENNETH LASSON, Jacob A. France Professor of Equality

Jurisprudence, University of Maryland School of Law; SUSAN PAULA LEVITON, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; SYLVIA A. LAW, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; AUDREY MCFARLANE, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; PAULA A. MONOPOLI, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; BURT NEUBORNE, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; JOHN T. NOCKLEBY, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; HELEN L. NORTON, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; DAVID A . J. RICHARDS, Jacob A. France

Professor of Equality Jurisprudence, University of Maryland School of Law; ELIZABETH M. SCHNEIDER, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; ELIZABETH J. SAMUELS, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; JANA B. SINGER, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; BARBARA ANN WHITE, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; TOBIAS BARRINGTON WOLFF, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; DIANE L. ZIMMERMAN, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION; AMERICAN MEDICAL WOMEN'S ASSOCIATION; MATERNAL AND CHILD HEALH ACCESS; PHYSICIANS FOR REPRODUCTIVE CHOICE AND HEALTH; CHESAPEAKE

REGIONAL CHAPTER OF THE SOCIETY
FOR ADOLESCENT HEALTH AND
MEDICINE; ROBERT BLUM; WILLARD
CATES, JR.; ERIC LEVEY; NADINE
PEACOCK; MARK SEIGEL; LAURIE
SCHWAB ZABIN; NARAL PRO-CHOICE
MARYLAND; NARAL PRO-CHOICE
AMERICA; CATHOLICS FOR CHOICE;
DC ABORTION FUND; LAW
STUDENTS FOR REPRODUCTIVE
JUSTICE; NATIONAL ABORTION
FEDERATION; MARYLAND CHAPTER
FOR THE NATIONAL ORGANIZATION
FOR WOMEN; NATIONAL ADVOCATES
FOR PREGNANT WOMEN; NATIONAL
ASIAN PACIFIC AMERICAN WOMEN'S
FORUM; PLANNED PARENTHOOD OF
MARYLAND; RELIGIOUS COALITION
FOR REPRODUCTIVE CHOICE;
SISTERSONG WOMEN OF COLOR
REPRODUCTIVE JUSTICE COLLECTIVE;
WHOLE WOMAN'S HEALTH OF
BALTIMORE; WOMEN'S LAW CENTER
OF MARYLAND, INCORPORATED;
DIANA DEGETTE; DONNA EDWARDS;
CAROLYN MALONEY; MIKE QUIGLEY;
LOUISE SLAUGHTER; JACKIE SPEIER;
HUMAN RIGHTS WATCH; SUSAN
DELLER ROSS, Professor,

*Amici Supporting Appellee.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, Senior District Judge.
(1:10-cv-00760-MJG)

Argued: March 23, 2012

Decided: June 27, 2012

Before NIEMEYER, KING, and AGEE, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Agee joined. Judge King wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Suzanne Sangree, BALTIMORE CITY DEPARTMENT OF LAW, Baltimore, Maryland, for Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. David William Kinkopf, GALLAGHER EVELIUS & JONES, LLP, Baltimore, Maryland, for Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop Edwin F. O'Brien, Archbishop of Baltimore and His Successors in Office, A Corporation Sole. **ON BRIEF:** Stephanie Toti, Special Assistant City Solicitor, Dipti Singh, Special Assistant City Solicitor, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, for Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. Peter J. Basile, FERGUSON, SHETELICH & BAL-

LEW, PA, Baltimore, Maryland; Steven G. Metzger, GALLAGHER EVELIUS & JONES, LLP, Baltimore, Maryland; Mark L. Rienzi, COLUMBUS SCHOOL OF LAW, Catholic University of America, Washington, D.C., for Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop Edwin F. O'Brien, Archbishop of Baltimore and His Successors in Office, A Corporation Sole. Maria T. Vullo, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, for Amici Curiae Law Professors in Support of Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. Douglas W. Baruch, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, Washington, D.C.; Janice Mac Avoy, Alexander T. Korn, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, New York, New York, for International Municipal Lawyers Association, Amicus Curiae in Support of Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. Simona G. Strauss, Melissa M. Derr, SIMPSON THACHER & BARTLETT LLP, Palo Alto, California; Jayma M. Meyer, Sarah L. Dunn, SIMPSON THACHER & BARTLESS LLP, New York, New York, for Amici Curiae Public Health Advocates in Support of Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. Kimberly A. Parker, Zaid A. Zaid, Stephanie Wright, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Catholics for Choice, DC Abortion Fund, Diana Degette, Donna Edwards, Law Students for Reproductive Justice, Carolyn Maloney, Maryland Chapter for the National Organization for Women, Naral Pro-Choice America, Naral Pro-Choice Maryland, National Abortion Federation, National Advocates for Pregnant Women, National Asian Pacific

American Women's Forum, Planned Parenthood of Maryland, Mike Quigley, Religious Coalition for Reproductive Choice, Sistersong Women of Color Reproductive Justice Collective, Louise Slaughter, Jackie Speier, Whole Woman's Health of Baltimore, Women's Law Center of Maryland, Incorporated, Amici Curiae in Support of Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. Priscilla J. Smith, YALE LAW SCHOOL INFORMATION SOCIETY PROJECT, Brooklyn, New York, for Human Rights Watch and Susan Deller Ross, Amici Curiae in Support of Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. Anna Franzonello, Mailee R. Smith, AMERICANS UNITED FOR LIFE, Washington, D.C., for Pregnancy Care Organizations Care Net, Heartbeat International, Incorporated, National Institute of Family and Life Advocates, Rocka-My-Baby Pregnancy Crisis Center, Bowie Crofton Pregnancy Clinic, Incorporated, Care Net Pregnancy Center of Frederick, Care Net Pregnancy Center of Southern Maryland, Laurel Pregnancy Center, and Rockville Pregnancy Center, Incorporated, Amici Curiae in Support of Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop Edwin F. O'Brien, Archbishop of Baltimore and His Successors in Office, A Corporation Sole. Cecilia N. Heil, Erik M. Zimmerman, AMERICAN CENTER FOR LAW & JUSTICE, Virginia Beach, Virginia; Carly F. Gammill, AMERICAN CENTER FOR LAW & JUSTICE, Brentwood, Tennessee; Colby M. May, James Matthew Henderson, Sr., Thomas J. Dolan, III, Tiffany N. Barrans, AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C., for American Center for Law and Justice, Amicus Curiae in Support of Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop Edwin F. O'Brien, Archbishop of

Baltimore and His Successors in Office, A Corporation Sole. Matthew S. Bowman, ALLIANCE DEFENSE FUND, Washington, D.C.; Samuel B. Casey, David B. Waxman, JUBILEE CAMPAIGN-LAW OF LIFE PROJECT, Washington, D.C., for American Association of Pro-Life Obstetricians and Gynecologists, Christian Medical & Dental Associations, and Catholic Medical Association, Amici Curiae in Support of Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop Edwin F. O'Brien, Archbishop of Baltimore and His Successors in Office, A Corporation Sole. John C. Eastman, CENTER FOR CONSTITUTIONAL JURISPRUDENCE, Chapman University School of Law, Orange, California; David T. Raimer, Noel J. Francisco, JONES DAY, Washington, D.C., for Amici Curiae Professors in Support of Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop Edwin F. O'Brien, Archbishop of Baltimore and His Successors in Office, A Corporation Sole.

---

## OPINION

NIEMEYER, Circuit Judge:

Archbishop Edward F. O'Brien, St. Brigid's Roman Catholic Congregation, Inc., and the Greater Baltimore Center for Pregnancy Concerns, Inc. ("the Pregnancy Center") commenced this action against the Mayor and City Council of Baltimore, challenging the constitutionality of the City's Ordinance 09-252, which requires that "limited-service pregnancy centers," such as the Pregnancy Center, post signs disclaiming that they "do[ ] not provide or make referral for abortion or birth control services." The complaint alleges that the ordinance, both facially and as applied to the plaintiffs, violates the plaintiffs' free speech, free exercise, and equal

protection rights under the First and Fourteenth Amendments to the U.S. Constitution, as well as the plaintiffs' rights under the Conscience Clause of Maryland's health law.

The district court granted summary judgment to the Pregnancy Center on its freedom of speech count, dismissed the Archbishop and St. Brigid's as plaintiffs for lack of standing, and dismissed the remaining counts without prejudice, in view of its free speech ruling. The court held that the disclaimer required by Ordinance 09-252 is "a form of compelled speech" that "alters the course of a [pregnancy] center's communication with a client or prospective client about abortion and birth-control" and "is based, at least in part, on disagreement with the viewpoint of the speaker." The court entered a permanent injunction barring enforcement of the ordinance. For the reasons that follow, we affirm.

I

In December 2009, the City of Baltimore enacted Ordinance 09-252. The ordinance applies to "limited-service pregnancy centers," which are defined as "any person"

> (1) whose primary purpose is to provide pregnancy-related services; and
>
> (2) who:
>
>> (i) for a fee or as a free service, provides information about pregnancy-related services; but
>>
>> (ii) does not provide or refer for:
>>
>>> (A) abortions; or
>>>
>>> (B) nondirective and comprehensive birth-control services.

Baltimore City Health Code § 3-501. Under the ordinance, "[a] limited-service pregnancy center must provide its clients and potential clients with a disclaimer substantially to the effect that the center does not provide or make referral for abortion or birth-control services." *Id.* § 3-502(a). This disclaimer must be made through one or more "easily readable" signs that are "conspicuously posted in the center's waiting room" and written in English and Spanish. *Id.* § 3-502(b). The failure to comply with the terms of the ordinance is punishable by a citation carrying a maximum civil penalty of $150. *Id.* § 3-506.[1]

The legislative record indicates that the President of the Baltimore City Council introduced Bill 09-406 (later to become Ordinance 09-252), after the City Council President had met with abortion rights advocacy groups, which complained that some pregnancy clinics provide inaccurate information to women about abortions. A spokesperson for the City Council President explained in a public statement: "The Bill deals with whether women are told up front what the facts are. Women need to know up front what to expect when they go into these centers." The "Bill Synopsis" presented to the City Council stated that the Bill was "introduced because of the 'importance of choice.'"

At the hearings on the Bill, representatives of Planned Parenthood of Maryland, NARAL Pro-Choice Maryland, and other pro-choice groups spoke in favor of the Bill, and repre-

---

[1]The Baltimore City Health Department enacted a regulation clarifying certain aspects of its enforcement of the ordinance, which it made effective July 15, 2010. Among other things, the regulation provides a definition of "non-directive and comprehensive birth-control services" and allows a pregnancy center to indicate on its disclaimer sign what birth-control services it does provide and/or refer for. The regulation's definition of "non-directive and comprehensive birth-control services" was subsequently amended to define that term as including all "birth-control services which only a licensed health care professional may prescribe or provide."

sentatives of the Archbishop, the Maryland Right to Life Committee, and other pro-life groups spoke in opposition. The Bill was enacted in November and became law on December 4, 2009.

The Pregnancy Center is a "limited-service pregnancy center," as defined in Ordinance 09-252, operating in Baltimore City from two locations and providing services to pregnant women, such as pregnancy testing; classes in prenatal development, post-pregnancy parenting, and life skills; Bible studies; and material support for women through its "Hannah's Cupboard" program, including diapers, formula, baby and maternity clothes, toys, and books. It also provides women with information on "abstinence and natural family planning, a form of birth control," but does not provide referrals "for abortions or other methods of birth control." The Pregnancy Center does not charge its clients for any of its services, which it provides through paid employees and volunteers, each of whom must sign a statement affirming his or her Christian faith and belief that abortion is immoral.

Archbishop Edward F. O'Brien, the Archbishop of Baltimore, is a corporate entity that owns the property on which the Pregnancy Center operates one of its locations and on which St. Brigid's Roman Catholic Church operates. Neither the Archbishop nor St. Brigid's charges the Pregnancy Center for the use of its space on the property.

In March 2010, before any enforcement of Ordinance 09-252, the Archbishop, St. Brigid's, and the Pregnancy Center commenced this action against the Mayor and City Council of Baltimore,[2] alleging violations of the Free Speech and Free

---

[2]The complaint names as defendants the Mayor and City Council of Baltimore, the Baltimore Health Department, Stephanie Rawlings-Blake, in her official capacity as Mayor of Baltimore, and Olivia Farrow, in her official capacity as Acting Baltimore City Health Commissioner. Dr. Oxiris Barbot became Baltimore City Health Commissioner on June 7, 2010, and he was then substituted as a defendant in place of Olivia Farrow.

Assembly Clauses of the First Amendment, the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Conscience Clause in Maryland Code, Health-General, § 20-214(a)(1) (providing that a "person may not be required to . . . refer . . . for . . . any medical procedure that results in . . . termination of pregnancy" and that the refusal to provide abortion referrals "may not be a basis for . . . [c]ivil liability to another person . . . or . . . [d]isciplinary or other recriminatory action"). The complaint alleges that the Pregnancy Center does not provide or refer for abortions, "based on moral and religious beliefs," and that Ordinance 09-252 specifically targets pro-life pregnancy centers such as the Pregnancy Center and thus "regulates communications at the Pregnancy Center that are personal, moral, political, and religious." It also states that "by requiring a disclaimer that the [pregnancy] center does not provide or refer for abortions, the ordinance compels plaintiffs to deliver the implied message that these services are available elsewhere and should be considered," thus appearing to legitimize such services, in violation of the plaintiffs' beliefs. The complaint also objects to the ordinance's requirement that the Pregnancy Center "post a sign saying that it does not provide birth control services," when in fact it does "in the form of education about abstinence and natural family planning," which, the complaint asserts, are medically recognized means of birth control. The plaintiffs seek a declaratory judgment that the ordinance is unconstitutional on its face and/or as applied to plaintiffs and an injunction prohibiting the ordinance's enforcement. Some two months after they filed their complaint but before the City filed its answer, the plaintiffs also filed a motion for partial summary judgment on their free speech and equal protection claims.

The City filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), alleging that the Archbishop and St. Brigid's lacked standing to sue and that the complaint otherwise failed to state a claim on which relief could be granted. In response to the plaintiffs' motion for

summary judgment, the City submitted an affidavit of an expert witness, along with a motion under Rule 56(f), requesting further discovery to amplify its response.

Following a hearing on the motions, the district court entered an order dated January 31, 2011, granting the City's motion to dismiss the Archbishop and St. Brigid's for lack of standing; denying the City's motion to dismiss, which it converted to a motion for summary judgment in view of the additional materials submitted by the parties; denying the City's request for further discovery as not necessary to the issue being decided; granting the Pregnancy Center's motion for summary judgment on its free speech claim, as set forth in Count 1; dismissing without prejudice the plaintiffs' remaining claims in view of its ruling on the free speech claim; and entering a judgment permanently enjoining the enforcement of the ordinance. In granting summary judgment to the Pregnancy Center on its free speech claim, the court applied strict scrutiny as the result of its conclusion that the ordinance compelled speech and was not viewpoint neutral and concluded that the ordinance violated the Pregnancy Center's free speech rights.

From the district court's judgment, the City appealed, challenging all of the court's rulings except the dismissal of the Archbishop and St. Brigid's. And the Archbishop and St. Brigid's filed a cross-appeal, challenging their dismissal for lack of standing.

II

We address first the plaintiffs' cross-appeal challenging the district court's dismissal of the Archbishop and St. Brigid's for lack of standing to challenge Ordinance 09-252. The district court reasoned that because the Archbishop and St. Brigid's "are not, and do not operate, limited-service pregnancy centers subject to the Ordinance," the ordinance "does not require the Archbishop and St. Brigid's to take any action and

does not subject them to liability" under the law. The court concluded, therefore, that the Archbishop and St. Brigid's did not suffer a "concrete and particularized" injury, as required under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

The Archbishop and St. Brigid's argue that the district court ignored the injury that they suffer as a result of the ordinance's infringement of their right to freedom of speech. They maintain that because they own the building in which the Pregnancy Center is located, they "suffer a constitutional harm when they are forced 'to use their private property as a . . . billboard for the State's ideological' message" (quoting *Wooley v. Maynard*, 430 U.S. 705, 715 (1977)). They also argue that "the Baltimore City Health Code leaves open the possibility that the City might seek to enforce the ordinance against the owner of the property [used by the Pregnancy Center]," citing Baltimore City Health Code § 5-201.

Although Ordinance 09-252 does require speech to be posted on property owned by the Archbishop and St. Brigid's, its mandate only applies to the space operated by the Pregnancy Center. The Archbishop and St. Brigid's do not qualify as a pregnancy center and they do not operate the Pregnancy Center. Indeed, the space where the disclosure would be located is separate from the church-operated portions of the building, and a regular visitor to the church would not see the disclaimer sign unless visiting the Pregnancy Center itself. In these circumstances it would be most doubtful that anyone would attribute the government's message to the Archbishop or St. Brigid's, rather than to the Pregnancy Center or the City.

The Archbishop and St. Brigid's suggestion that they do not charge for the use of their space and thus are not "ordinary landlords" does not change the analysis. If anything, this fact might cut against them because, by their own admission, their interest in the ordinance is related primarily to a "desire to

promote life over abortion." Ideological injuries of this sort, without more, have routinely been held insufficient to support standing, *see, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972), even when those ideologies are intertwined with religious beliefs, *see, e.g.*, *Harris v. McRae*, 448 U.S. 297, 320-21 (1980).

We also conclude that there is little likelihood that the Archbishop or St. Brigid's could face liability if the Pregnancy Center violated Ordinance 09-252. By its terms, the ordinance only authorizes the issuance of environmental or civil citations to pregnancy centers themselves, and contains no provisions for joint-and-several liability of landlords. *See* Baltimore City Health Code § 3-506. And the portion of the City Health Code that the Archbishop and St. Brigid's cite as a potential basis for liability, § 5-201, relates only to nuisance abatement; it has no connection to Ordinance 09-252 and does not indicate that a failure to comply with the other, non-nuisance-related regulations can be penalized. *See* Baltimore City Health Code § 5-101 (defining nuisances); *id.* § 5-209 (enforcement provisions).

Accordingly, we affirm the district court's ruling that the Archbishop and St. Brigid's lack standing to challenge the ordinance.

## III

In its appeal, the City contends first that the district court erred in applying strict scrutiny to the ordinance. It argues that the ordinance, even though compelling speech, compels *commercial* speech, which is subject to a lower level of scrutiny, involving the determination of whether the "disclosure requirements are *reasonably related* to the State's interest in preventing deception of customers." Alternatively, the City urges us to draw on the disclosure requirements of election law and abortion regulation, with respect to which cases have

applied an "exacting" scrutiny standard or other intermediate scrutiny standard.

The Pregnancy Center contends that compelling someone to speak a message that the speaker would not otherwise make is a content-based regulation that is subject to strict scrutiny. Responding to the City's argument that Ordinance 09-252 compels *commercial* speech, the Pregnancy Center maintains that, to the contrary, the ordinance targets its free provision of information about pregnancy and not any proposal for a commercial transaction. Indeed, it notes that it does not sell any goods or services. At bottom, it asserts that no case supports the City's claim that "government can require private speakers to post a government-mandated message in their waiting room (to all visitors, at all times) unrelated to any commercial transaction being proposed by the speaker."

We begin by noting that the ordinance does indeed compel the Pregnancy Center to speak, mandating it to post a sign that it "does not provide or make referral for abortion or birth-control services." Moreover, in compelling that speech, the Pregnancy Center is, in this case, required to participate in the City's effort to tell pregnant women that abortions are available elsewhere as a morally acceptable alternative, contrary to the moral and religious beliefs of the Pregnancy Center. A representative of the Pregnancy Center stated that absent the ordinance's mandate, the Pregnancy Center would not speak to clients and potential clients in the manner required by the ordinance.

It is well-established that a regulation compelling non-commercial speech is subject to strict scrutiny and must be narrowly tailored to serve a compelling governmental interest. *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). The First Amendment protects not only "the right to speak freely," but also "the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714

(1977); *see also Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 557, 573 (1995) ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say" (internal quotation marks omitted)). Because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," laws that compel speech are normally considered "content-based regulation[s] of speech" and therefore are subject to strict scrutiny. *Riley*, 487 U.S. at 795. Indeed, strict scrutiny applies even in cases where the compelled disclosure is limited to factually accurate or non-ideological statements. *Id.* at 797-98 (invalidating a requirement that professional fund-raisers disclose to potential donors the percentage of charitable contributions collected during the previous 12 months that were actually turned over to the charity); *see also Hurley*, 515 U.S. at 573 (the "general rule[ ] that the speaker has the right to tailor the speech[ ] applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact").

The City does not take issue with these First Amendment principles, generally. Rather, it argues that the speech mandated here is *commercial* speech and therefore is subject to the lower standard of judicial scrutiny applicable to commercial speech. Alternatively, it argues that the speech mandated here is analogous to election-law disclosures or abortion-regulation disclosures, both of which have been evaluated under a lower level of scrutiny than strict scrutiny. We address each of these arguments in order.

A

In making the argument that Ordinance 09-252 regulates commercial speech, the City contends that "when a Pregnancy Center offers to provide commercially valuable, pregnancy-related goods or services to a consumer, the Pregnancy Center is proposing a commercial transaction." Specifically, the City asserts that although many pregnancy centers operate as non-

profits, they effectively engage in commerce by offering pregnancy testing, sonograms, and options counseling, "all of which have commercial value, garnering payments and fees in the marketplace." Appellants Br. at 16 (citing *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 573 (1997) (holding that a nonprofit summer camp was engaged in commerce for purposes of the dormant Commerce Clause)). The City's formulation of the commercial speech doctrine, however, is not supported by the law.

The Supreme Court has defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). Stated in another way, the hallmark of commercial speech is that it "does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (internal quotation marks omitted); *see also* Martin H. Redish, *Commercial Speech, First Amendment Intuitionism and the Twilight Zone of Viewpoint Discrimination*, 41 Loy. L.A. L. Rev., 67, 75 (2007) ("[T]he [Supreme] Court has unambiguously adopted the view that commercial speech is confined to expression advocating purchase"). In some circumstances, such as when expression clearly promotes a speaker's economic interests, speech may be classified as commercial even when it "cannot be characterized merely as proposals to engage in commercial transactions." *Bolger*, 463 U.S. at 67-68 (holding that advertisements discussing the health benefits of contraceptives were commercial speech); *see also Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, __ F.3d __, 2012 WL 1851326 (4th Cir. May 22, 2012) (holding that business's outdoor mural was commercial speech where business conceded mural was advertising and "had an economic motivation for displaying the painting"). But speech does not "retain[ ] its commercial character when it is inextricably intertwined with otherwise fully protected speech." *Riley*, 487 U.S. at 796.

Rather than regulating traditional commercial advertising, Ordinance 09-252 targets speech regarding the provision of

"free services." While this fact alone might not be dispositive, it becomes so in this case because there is no indication that the Pregnancy Center is motivated by any economic interest or that it is proposing any commercial transaction. The Pregnancy Center seeks to provide free information about pregnancy, abortion, and birth control as informed by a religious and political belief. This kind of ideologically driven speech has routinely been afforded the highest levels of First Amendment protection, even when accompanied by offers of commercially valuable services. *See, e.g.*, *In re Primus*, 436 U.S. 412, 422, 439 (1978) (holding that a lawyer's solicitation of pro-bono client was protected by the First Amendment because the lawyer's actions "were undertaken to express personal political beliefs and to advance . . . civil-liberties objectives . . . rather than to derive financial gain").

The City's argument does not address what commercial transaction is proposed by the Pregnancy Center's speech or what economic interest motivates the Pregnancy Center's speech. Instead, the City would define commercial speech to include any speech that offers services "*which have commercial value*, garnering payments and fees in the marketplace" generally. Adopting this definition of commercial speech would effect an unprecedented expansion of the commercial speech doctrine and is unsupported by citation to any applicable Supreme Court precedent. As the district court explained, the City's position would mean that "any house of worship offering their congregants sacramental wine, communion wafers, prayer beads, or other objects with commercial value, would find their accompanying speech subject to diminished constitutional protection." Indeed, it is difficult to imagine any charitable organization whose speech would not be considered "commercial" under the City's proposed broad definition.

In short, we agree with the district court that the pregnancy centers are not engaged in commercial speech and that their

speech cannot be denied the full protection of strict scrutiny on that basis.

B

The City argues alternatively that if the Pregnancy Center's speech is not considered commercial speech, it should still be accorded reduced protection because the disclaimer required by Ordinance 09-252 is analogous to the disclosure requirements imposed on abortion providers and in campaign finance laws, both of which are subject to a lower level of scrutiny than strict scrutiny. *See Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992) (plurality opinion) (applying intermediate scrutiny to disclosure requirements under Pennsylvania's abortion law); *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 914 (2010) (applying "exacting scrutiny" to campaign finance disclosure requirements).

The differing contexts of the speech restrictions in those cases, however, render the cases inapplicable to the compelled speech before us. In *Casey*, the mandatory disclosures focused on the speech of licensed medical professionals, and the regulations were upheld because, even though they implicated a physician's right not to speak, they did so "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Casey*, 505 U.S. at 884. More particularly, the regulations there were permissible because they facilitated the process of obtaining a patient's informed consent prior to performing a medical procedure. Thus the regulation of such professional speech was imposed incidental to the broader governmental regulation of a profession and was justified by this larger context. In contrast, the pregnancy centers that are subject to Ordinance 09-252 do not practice medicine, are not staffed by licensed professionals, and need not satisfy the informed consent requirement.[3]

---

[3]The Supreme Court has not recognized the notion that "professional speech," unconnected to state regulation or licensing, is entitled to less

Similarly, the exacting scrutiny standard applied to finance disclosure laws in the campaign finance cases is justified by circumstances that are also not applicable here. In the Supreme Court's cases of *Citizens United* and *Buckley v. Valeo*, 424 U.S. 1 (1976), the Court drew a distinction between regulations that limit campaign contributions and restrict campaign activities and regulations that merely require the disclosure of objective financial information. The Supreme Court has never suggested that *Buckley*'s holding that disclosure requirements do not substantially burden speech applies to speech regulations more generally. *See Doe v. Reed*, 130 S. Ct. 2811, 2818 (2001) ("We have a series of precedents considering First Amendment challenges to disclosure requirements *in the electoral context*" (emphasis added)). While disclosure of campaign contributions or expenditures will always be limited to factual information, the line between fact and opinion in most compelled speech cases will be much harder to draw. Thus, campaign finance disclosure laws are less likely to be impermissibly content- or viewpoint-based and pose a lower risk of altering the speaker's message. The regulation imposed by Ordinance 09-252, however, burdens the content of speech generally, requiring pregnancy centers to speak in a manner that they might otherwise wish to avoid. This type of regulation is significantly more analogous to the restrictions on campaign speech that the Court held were subject to strict scrutiny. *See Citizens United*, 130 S. Ct. at 898; *Buckley*, 424 U.S. at 58-59.

---

protection under the First Amendment. We have, however, recognized that the government may regulate the professions and, as necessary to serve the state's interest in such regulation, so regulate the professionals' speech. *See Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 603-05 (4th Cir. 1988) (noting that "governmental regulation of the professions is constitutional if the regulations have a rational connection with the applicant's fitness or capacity to practice the profession" (internal quotation marks omitted)). The City, however, does not claim that the Pregnancy Center's employees and volunteers are state-regulated professionals.

Accordingly, we affirm the district court's conclusion that Ordinance 09-252 regulates the Pregnancy Center's fully protected, non-commercial speech and therefore is subject to strict scrutiny.[4]

IV

"Content-based [speech] regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). The City thus bears the burden of rebutting the presumption of invalidity. *Playboy Entm't Group*, 529 U.S. at 817. Indeed, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Id.* at 818. The City can, nonetheless, rebut the presumption if it is able to show that the ordinance is "narrowly tailored to promote a compelling Government interest," such that the ordinance is the "least restrictive alternative" to serve the government's purpose. *Id.* at 813; *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

The City claims it can satisfy this strict scrutiny standard, arguing that it has at least two compelling interests served by the ordinance and that the ordinance is narrowly tailored to promote those interests. First, the City claims that it has an interest in countering what it maintains are the "deceptive

---

[4]Strict scrutiny would generally be appropriate also because the Ordinance is not viewpoint neutral. By its terms, Ordinance 09-252 does not apply to all speakers who "provide information" about pregnancy. Rather, the law targets *only* those speakers who refuse to provide or refer for abortions or certain types of birth control. This qualification effectively limits the law's disclosure obligations to organizations whose moral or religious codes lead them to oppose abortion and birth control. *Cf. Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2663 (2011) (concluding that law was speaker- and content-based where the "practical effect" was to burden one group of speakers). These speakers are disfavored because they have chosen, for whatever reason, not to adopt the City's preferred perspective on appropriate reproductive decisions. Although it is true that disparate impact alone is not enough to make a law viewpoint discriminatory, *see Hill v. Colorado*, 530 U.S. 703, 724–25 (2000), the text of the ordinance and its legislative history demonstrate that it burdens only the expression of pro-life speakers, as it was intended to do.

business practices" of certain pregnancy centers. According to the City, these practices include deceptive advertising, delaying tactics intended to prevent women from obtaining abortions, and misleading statements about the medical and psychological impact of abortion. To support this argument, the City cites two reports that purport to document the deceptive practices of pregnancy centers: A 2006 report prepared for U.S. Representative Henry Waxman, and a 2008 report compiled by the NARAL Pro-Choice Maryland Fund detailing the results of its investigation of pregnancy centers in Maryland.

Second, the City argues that it has an interest in protecting the health of pregnant women and in ensuring that pregnant women who seek abortions have prompt access to medical services. The City notes that the risks and costs associated with abortion increase as a woman advances through her pregnancy. Similarly, the City contends that "delays in access to the birth-control method of an individual's choice can leave the individual and his or her partner vulnerable to unintended pregnancy and sexually transmitted disease." Thus, the City argues, delays in obtaining abortion services pose a clear threat to public health.

To be sure, the City has a considerable interest in promoting the general health and well-being of its citizens. But as the Supreme Court recently reiterated, to demonstrate the existence of a *compelling* interest, a government "must specifically identify an 'actual problem' in need of solving." *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2740 (2011) (quoting *Playboy Entm't Group*, 529 U.S. at 822-23). Although the existence of such a problem need not be exhaustively documented, "the Government must present more than anecdote and supposition" to support a speech restriction. *Playboy Entm't Group*, 529 U.S. at 822. With respect to Ordinance 09-252, and the Pregnancy Center, the City failed to carry its burden to show a compelling interest.

Here, the record establishes, at most, only isolated instances of misconduct by pregnancy centers generally, and, as the City concedes, none by the Pregnancy Center itself. Indeed, the record contains no evidence that any woman has been misled into believing that any pregnancy center subject to Ordinance 09-252 was a medical clinic or that a woman in Baltimore delayed seeking medical services because of such a misconception. The City instead cites allegations of deceptive practices occurring in other locations or second-hand reports of "stories about harassment." The City's failure to provide more than speculative evidence of problems at Baltimore's pregnancy centers strongly suggests that the need for regulation of those centers is not as pressing as the City asserts.

The City's claim of a compelling interest is also called into question by its selective pursuit of its interest. While the City asserts that it is primarily concerned with ensuring that women receive accurate information about their pregnancies, Ordinance 09-252 does not focus on or reach the vast majority of sources that pregnant women would likely consult. Bookstores, websites, religious leaders, and pregnant women's friends and family — all of whom might potentially provide a woman with "incorrect" information about her pregnancy — are unaffected by the ordinance. This kind of underinclusiveness "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 131 S. Ct. at 2740; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546-47 (1993) ("Where government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling").

Moreover, the City's claim to be promoting a *compelling* interest is seriously undermined by its failure to pursue any

other course to promote its interest other than to restrict the Pregnancy Center's speech. This fact is particularly salient based on the City's admission that the record reflects that it has done nothing other than enact Ordinance 09-252 to combat the perceived danger of misleading information from the Pregnancy Center and like facilities. The need was thus not so compelling as to cause the City to post a single notice in any City building or facility, to place a warning on its own website, or to give any public service information in furtherance of its interest. The City also conceded that it has referred and continues to refer women to the Pregnancy Center without any forewarning as to the danger of misinformation the City believes the women will encounter there. To find, with these facts, that the City has shown a compelling interest would be dubious at best.

We need not, however, rely entirely on the weakness of the City's demonstration that in enacting the ordinance, it was promoting a compelling government interest, because the more significant problem for the City — the one that we find fatal—is that the ordinance is not narrowly tailored to serve the City's interest. "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963) (citations omitted). Courts may find that a statute is not narrowly tailored when, among other things, the statute does not advance the purported compelling interests, *e.g.*, *Meyer v. Grant*, 486 U.S. 414, 426 (1988); or when the statute is overinclusive, *e.g.*, *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120-21 (1991); or when the government has other, less speech-restrictive alternatives available, *e.g.*, *Playboy Entm't Group*, 529 U.S. at 816-17. We conclude that Ordinance 09-252 is an example of all three of these indicators.

First, the ordinance purports to target false advertising, yet it fails actually to regulate "deceptive practices" or false advertising. Further, the ordinance applies to all pregnancy centers *regardless* of whether they advertise at all.

Second, the ordinance is overinclusive in that it applies equally to pregnancy centers that engage in deceptive practices and those whose speech is entirely truthful. *See Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 265 (1986) (stating that for a law to be narrowly tailored "government must curtail speech only to the degree necessary to meet the particular problem at hand" and "must avoid infringing on speech that does not pose the danger that has prompted regulation").

Finally, there are also several alternatives that would address the problems targeted by the ordinance while imposing a lesser burden on speech. Most obviously, the City could speak with its own voice. It might, for example, use its own resources to undertake public education campaigns addressing the alleged dangers of pregnancy centers, or more generally, promoting consultation with physicians for pregnant women. *Cf. Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) ("It is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal of promoting temperance. . . . [E]ducational campaigns focused on the problems of excessive, or even moderate, drinking might prove to be more effective"). The City could also produce a document or website listing local pregnancy centers and noting what services are available at each. *See Riley*, 487 U.S. at 800 ("[T]he State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech"). And the City always retains the option of prosecuting violations of its criminal and civil laws that proscribe deceptive advertising and deceptive statements made by pregnancy cen-

ters. *See Riley*, 487 U.S. at 800; *see also Nefedro v. Montgomery Cnty.*, 996 A.2d 850, 863 (Md. 2010) (holding that fraud laws were a less restrictive alternative to a law prohibiting remuneration for fortunetelling).

That the City resorted to speech restrictions before trying these or other similar options is more than enough to doom the ordinance. *See Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 373 (2002) ("If the First Amendment means anything, it means that regulating speech must be a last—not first —resort").

The City seeks to salvage the ordinance by arguing that it imposes on pregnancy centers a burden that is *de minimis*, and that the signage requirement is less restrictive than other methods of communicating the disclaimer. The City suggests, for example, that it could have required the disclaimer to be included on "every page of a pregnancy center's website, as well as text in all paid advertisements, brochures, and other written materials." But this argument does not save the law. First, the impact is not minimal. As the district court found below, the ordinance inevitably "alters the course of a center's communications with a client or potential client" by requiring that the Pregnancy Center's initial communication occur in "the presence of a stark and immediate statement about abortion and birth-control." Second, even a *de minimis* restriction on speech would not make the ordinance the *least* restrictive option, as required to survive strict scrutiny. *See Playboy Entm't Group*, 529 U.S. at 813.

In sum, while the city has not demonstrated a *compelling* government interest rather than simply its disfavor with a particular speaker's speech, we do not rest on that failure because Ordinance 09-252 is not narrowly tailored to promote the City's interest so as to justify its intrusion on the Pregnancy Center's speech. Accordingly, we hold that Ordinance 09-252 is invalid, in violation of the First Amendment presumption

that "speakers, not the government, know best both what they want to say and how to say it." *Riley*, 487 U.S. at 791.

V

Finally, the City contends that the district court abused its discretion (1) in converting its motion to dismiss into a motion for summary judgment, without giving it prior notice and without allowing it discovery before deciding the motion, and (2) in dismissing the plaintiffs' remaining counts (other than the free speech count) without prejudice, rather than with prejudice. We find no error in these rulings and also see no prejudice to the City.

By converting the City's Rule 12(b)(6) motion into a summary judgment motion, the district court did not deny the City its opportunity to press its claim that the complaint failed to state a claim upon which relief could be granted. This procedural ruling, in the context of the plaintiffs' pending motion for summary judgment, simply gave recognition to the fact that the court would be looking at the case more broadly on plaintiffs' summary judgment motion. Because of that motion, the City was on notice that the court would be considering matters beyond the complaint to resolve the plaintiffs' free speech claim and that the City should, if it wished, file a response to that motion for summary judgment. The procedural conversion in this context had the effect simply of allowing the court to consider the parties' dispositive motions as cross-motions for summary judgment and take into account any evidence that the parties might wish to submit. And indeed, the City did submit matters outside of the complaint and its motion to dismiss for consideration by the court.

The City argues that additional discovery would have given it "the opportunity to gather additional support for key factual propositions, including that Pregnancy Centers engage in deceptive advertising, such deception threatens public health, and the provision of services by Pregnancy Centers is a form

commerce." The dissent adopts the same position. But as the district court explained, additional discovery was unnecessary. The district court assumed for purposes of its analysis that the Ordinance served the compelling interests that the City claimed. Instead of exploring any factual context that might be relevant to that proposition, the court struck down Ordinance 09-252 because it was not narrowly tailored, a problem that was apparent on the face of the Ordinance. "Whether [a] regulation meets the 'narrowly tailored' requirement is of course a question of law." *United States v. Doe*, 968 F.2d 86, 88 (D.C. Cir. 1992); *see also Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980) (overbreadth is "a question of law that involved no dispute about the characteristics of" the law being challenged). Because additional discovery could not eliminate the narrow tailoring problems, as we have discussed above, the court was well within its rights to decide the First Amendment issues on the record before it. *Cf. Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 129 (1989) (affirming district court's grant of preliminary injunction where the pre-enactment record contained "no legislative findings that would justify us in concluding that there is no constitutionally acceptable less restrictive means, short of a total ban, to achieve the Government's interest"); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1274 (11th Cir. 2005) (invalidating content-based sign regulation without discovery because "[t]he First Amendment questions [were] purely legal" and "only minimally intertwined with the facts").

The City's remaining justification for discovery—that it was necessary to show that pregnancy centers engage in commercial speech—is also unavailing. The district court found that the law *on its face* regulated protected, non-commercial speech. The individual characteristics of any particular pregnancy center would thus be irrelevant to this determination, a fact the City itself acknowledged during a hearing on the parties' motions:

The Court: [T]he City Council wasn't concerned about this individual center. There's the legislative history. They were concerned about the generalities of it. So I don't see where we would advance the ball one way or the other on the facial challenge by knowing what these particular people [i.e. the plaintiffs] did.

Counsel for the City: I agree with you.

J.A. 130.

Moreover, as the district court recognized, even if *some* speech of regulated pregnancy centers included commercial elements, strict scrutiny would still apply because those elements would be "inextricably intertwined" with otherwise fully protected speech. Thus, for example, an advertisement offering a pregnant woman the opportunity to "see a picture of your baby" is both an offer to provide a service—a sonogram—and a political statement regarding the status of fetal life. Contrary to the dissent's claims, the commercial and political aspects of a statement of this kind cannot be "easily separated," as the dissent suggests. Indeed, the Supreme Court rejected precisely this argument in *Riley* in the course of holding that solicitations by professional fundraisers were not commercial speech. *See Riley*, 487 U.S. at 796 ("[W]e cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected expression"). Thus, even if additional discovery could somehow uncover facts suggesting that the Pregnancy Center itself or other pregnancy centers engaged in some amount of commercial speech (because, for instance, they may have charged money for some of their services), the district court's reasoning would still have led to the application of strict scrutiny.

In sum, the city has been unable to point to any item of discovery or fact that would have assisted the district court in addressing the issues that have been appealed.

Finally, the City's contention that the district court abused its discretion in dismissing the Pregnancy Center's remaining counts *without prejudice*, rather than *with prejudice*, lacks merit. The district court did not reach the merits of the Pregnancy Center's other claims, which on their face were not frivolous. It simply dismissed those counts because it awarded the Pregnancy Center all the relief that it had requested, based on its ruling on the free speech count.

For the reasons given, the judgment of the district court is

*AFFIRMED*.

KING, Circuit Judge, dissenting:

I lament that, in its haste to wholly and permanently enjoin the City of Baltimore's enforcement of its duly enacted Ordinance, the district court has flouted foundational legal principles. Rushing to summary judgment, the court subverted the Federal Rules of Civil Procedure — time-tested rules designed to further the venerable constitutional principle of due process, *see Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465 (2000) — by, inter alia, denying the City essential discovery, refusing to view in the City's favor what evidence there is, and making untoward findings of fact, often premised on nothing more than the court's own supposition. Meanwhile, thinly disguising its First Amendment as-applied analysis of the Ordinance as a facial review, the court prematurely and unfairly discounted the real possibility that the Ordinance targets only commercial speech, condemned the Ordinance as viewpoint discriminatory, and, applying strict scrutiny, nullified the Ordinance for lack of narrow tailoring. The court's decision is, in a word, indefensible.

Nevertheless, the panel majority not only endorses the district court's unseemly approach, but engages in further imprudence. As but one example, while the district court was at least willing to assume that the Ordinance is undergirded by a compelling interest, the majority opines at length on the insufficiency and insincerity of the interests and positions advanced by the City. Because these proceedings have thus followed a course more fitting a kangaroo court than a court of the United States, I write separately in dissent.[1]

I.

In order to properly explain the defective rulings of the district court and the panel majority, I briefly retrace the genesis of the Ordinance and the fleeting procedural history of this case.

A.

In response to congressional and statewide reports that women were being deceived by limited-service pregnancy centers, Baltimore's City Council conducted hearings on the issue in 2009. As the majority acknowledges, the City Council, prior to its adoption of the Ordinance, specifically considered the 2006 Waxman and 2008 NARAL reports documenting a pattern of deceptive practices by limited-service pregnancy centers nationwide. The Waxman report found that several such centers throughout the county were using deceptive advertising techniques to attract women seeking abortions and comprehensive birth-control services. Those techniques included placing ads in the telephone book's yellow pages under "abortion services" and on the Internet generated by keyword searches of "abortion" and "abortion

---

[1]I dissent from the majority's constitutional ruling in the City's appeal, No. 11-1111. I have no quarrel with its disposition of the cross-appeal, No. 11-1885, deeming plaintiffs St. Brigid's and the Archbishop to be without standing.

clinics." *See* J.A. 417-18.[2] The NARAL report found that similar deceptive practices were being used by limited-service pregnancy centers in Maryland, including in the City of Baltimore. During its 2009 hearings, the City Council heard evidence from a number of women complaining about being deceived by pregnancy center advertising. *See id.* at 212. One witness related her experience as a teenager, being subjected to anti-abortion advocacy when she visited a pregnancy center because it advertised in the telephone book under "Abortion Counseling." *Id.* at 261. A college professor referenced "countless stories" from female students who had similar experiences when they visited pregnancy centers. *Id.* at 273.

The evidence relied on by the City Council revealed that limited-service pregnancy centers were using questionable tactics to delay women from accessing abortions. Such tactics included counseling women to undergo pregnancy tests and sonograms that were scheduled weeks after their initial pregnancy center visit, and misinforming women about abortion services, including when abortions could be lawfully obtained. Such delays placed the health of women who decided to have abortions at risk, as "[n]umerous studies have shown that it is safest to have an abortion within the first trimester." *See* J.A. 331.

Importantly, the City's Health Department studied the matter and supported the Council's adoption of the proposed Ordinance, agreeing that it was "imperative that all Baltimore City women have the ability to obtain factual and timely advice on all available health care options." J.A. 209. Before taking action, the City Council prudently sought the views of the City Solicitor, who concluded that the proposed Ordinance did not contravene the First Amendment. By letter opinion of October 23, 2009, the Solicitor advised the Council that

---

[2]Citations herein to "J.A.___" refer to the contents of the Joint Appendix filed by the parties in these appeals.

[the Ordinance] requires disclosure of factual, truth-ful, non-misleading information; namely, whether or not abortion or birth control services are provided at a given facility. The [Ordinance] serves the purpose of preventing misleading advertising practices of pregnancy services centers and furthers the City's interest in ensuring a woman seeking these services in the City is fully informed of what services are available at any given location and can find the ser-vices that she needs in a timely manner whether they be abortion or birth control services or any of the many other pregnancy related services that a woman may be seeking. . . . The [Ordinance], therefore, does not violate the 1st Amendment right to freedom of speech.

*Id.* at 208. During a public hearing on the proposed Ordi-nance, its sponsor in the Council clarified that the "bill is not about an abortion debate, but a simple sign . . . to make sure no one is misled and [pregnancy center clients] know what to expect." *Id.* at 211.

Thus, after considering the matter thoroughly, the Council concluded that the various deceptive practices of limited-service pregnancy centers posed a danger to public health. As a result, on December 5, 2009, the City Council enacted the Ordinance, which took effect on January 4, 2010.

B.

On March 29, 2010, the plaintiffs in this case — including the Greater Baltimore Center for Pregnancy Concerns, Incor-porated (the "Center") — challenged the Ordinance in federal court, asserting various constitutional defects, including free speech, free assembly, free exercise, and equal protection, plus related state law claims. On June 4, 2010, barely two months after service of the Complaint — and four days before the City's responsive pleading was due — the Center moved

for summary judgment on its free speech and equal protection challenges. No party had by then either initiated or conducted discovery.[3] Consistent with the lack of discovery, the City, on June 8, 2010, filed a Rule 12(b)(6) motion seeking dismissal of the Complaint. Then, on July 16, 2010, in response to the Center's summary judgment motion, the City filed a declaration pursuant to Rule 56(f), averring that it could not adequately oppose summary judgment without first conducting discovery (the "Declaration").[4]

The Declaration specified that the City needed "the opportunity to develop expert testimony to provide factual support for the propositions that deceptive advertising by limited-service pregnancy centers threatens public health in a variety of ways." J.A. 41. The Declaration also explained that the City desired and required "the opportunity to conduct discovery concerning the advertising that the Center and other limited-service pregnancy centers employ, so [it] may demonstrate [the advertising's] deceptive character." *Id.* at 42. The

---

[3]By applicable rule, no party had the right to serve or seek discovery when the Center's summary judgment motion was filed. *See* Fed. R. Civ. P. 26(d)(1) (providing that, unless otherwise stipulated or ordered, "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)").

[4]The Declaration was filed pursuant to the version of Rule 56(f) then in effect. Under the 2010 Amendments to the Civil Rules, "[s]ubdivision (d) carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56 advisory committee's note. The current subdivision (d) of Rule 56 provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

City requested "discovery to develop factual support for [its] argument that the services offered by [the Center] are a form of commerce, and, therefore, the disclaimer required by the Ordinance is commercial speech." *Id.*

Additionally, the City filed the declaration of an expert, Robert W. Blum, M.D., M.P.H., Ph.D. (the "Blum declaration"), seeking to substantiate the City's compelling interests advanced by the Ordinance. More specifically, Dr. Blum explained that, because family planning improves "the health and well-being" of women and their children, public health is promoted by providing "complete and accurate information to women about their health care options." J.A. 45. "Women who can plan the number and timing of their births," Dr. Blum observed, "experience fewer unwanted pregnancies and births and have lower rates of abortion." *Id.* Young and poor women, however, are "particularly vulnerable to being deceived by limited-service pregnancy centers that fail to disclose the scope of services that they provide." *Id.* at 46.

On August 4, 2010, the district court heard argument on the City's motion to dismiss and the Center's summary judgment motion. The court advised the parties, however, that if it intended to award summary judgment to the Center on its as-applied challenge, discovery would be necessary. By its January 28, 2011 decision, the court denied the City's discovery requests and converted the City's pending Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment. *See O'Brien v. Mayor of Balt.*, 768 F. Supp. 2d 804, 809-10 (D. Md. 2011). The court then treated the parties' respective submissions as cross-motions for summary judgment, ruling for the Center on its free speech claim and dismissing without prejudice (and as moot) each of the Center's remaining claims. On January 31, 2011, the court fully and permanently enjoined enforcement of the Ordinance.[5]

---

[5]At the outset of this litigation, the City agreed not to enforce the Ordinance until December 31, 2010, or until the district court had made a final

## II.

### A.

As a general proposition, "summary judgment is appropriate only after adequate time for discovery." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996) (internal quotation marks omitted). In the main, discovery is essential in a contested proceeding prior to summary judgment because a party can show that the relevant facts are undisputed only by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Hence, "by its very nature, the summary judgment process presupposes the existence of an adequate record." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007). At minimum, a court "must refuse summary judgment where the nonmoving party has not had the

---

decision, whichever was earlier. That commitment apparently expired at the end of 2010, prior to the summary judgment award. Nevertheless, had the district court reasonably ascertained from the parties' submissions that, inter alia, the Center was likely to succeed on its free speech claim, the court should have adhered to Rule 65 and entered a temporary restraining order ("TRO") against the Ordinance. After entering a TRO, the court should have conducted appropriate proceedings to entertain preliminary and permanent injunction requests. Instead, the court elected to award summary judgment on the merits of the free speech issue, entering a permanent injunction based on an undeveloped record.

opportunity to discover information that is essential to [its] opposition." *See Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008) (internal quotation marks omitted).

The City took "the proper course" when it filed the Declaration, "stating that it could not properly oppose . . . summary judgment without a chance to conduct discovery." *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (internal quotation marks omitted) (deeming summary judgment award premature where, inter alia, court made its award only six weeks after complaint was filed, before significant discovery). Such a declaration is "broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010) (internal quotation marks omitted); *accord Harrods Ltd.*, 302 F.3d at 245 n.18. Nevertheless, the district court decided that the City's discovery requests were merely "an attempt to generate justifications for the Ordinance following its enactment." *O'Brien*, 768 F. Supp. 2d at 810. The court explained that discovery was unnecessary in examining "whether the Ordinance, on its face, is subject to, and satisfies, the applicable level of scrutiny." *Id.* Indeed, the court considered itself constrained to "base its decision on the evidence relied on by the [City] at the time the Ordinance was passed." *Id.*

We review for abuse of discretion a district court's denial of "discovery before ruling on a summary judgment motion." *Nader*, 549 F.3d at 959-60. A court abuses its discretion, however, when "its conclusion is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *Belk, Inc. v. Meyer Corp., U.S.*, No. 10-1664, ___ F.3d ___ (4th Cir. 2012) (internal quotation marks omitted). As explained below, the district court's rationale for denying the City its right to discovery was patently erroneous.

1.

As an initial matter, the district court legally erred in denying discovery prior to converting the City's motion to dismiss into a request for summary judgment. The majority states that "the City was on notice that the court would be considering matters beyond the complaint to resolve the plaintiffs' free speech claim." *Ante* at 40. As we have previously explained, however, "notification that a Rule 12(b)(6) motion may be converted is only one of the requirements" for a proper conversion; "[o]nce notified, a party must be afforded a reasonable opportunity for discovery before a Rule 12(b)(6) motion may be converted and summary judgment granted." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (internal quotation marks omitted); *see E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 450 (4th Cir. 2011) (concluding that the court erred in converting a motion to dismiss to a summary judgment motion where the "record indicates that the parties had not yet had the opportunity to conduct reasonable discovery"). The explicit authorization of discovery articulated by Judge Ervin in the *Gay* decision is applicable precedent here, and is also prescribed by Rule 12(d). That rule provides that, when a Rule 12(b)(6) motion is "treated as one for summary judgment under Rule 56," the "parties *must* be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d) (emphasis added). This controlling authority has been ignored entirely by the district court and by the majority.

The district court's justification for refusing to authorize or permit the City to conduct discovery rested on an erroneous perception that further factual development was not germane to the Center's facial free speech challenge to the Ordinance. I acknowledge that a court may, in the proper circumstances, rule on a "summary judgment motion without allowing further discovery," where "a facial challenge to an ordinance . . . may be resolved as a question of law." *Penn Adver. of Balt., Inc. v. Mayor of Balt.*, 63 F.3d 1318, 1322-23 (4th Cir. 1995),

*vacated on other grounds*, 518 U.S. 1030 (1996). In such limited circumstances, discovery is unnecessary because "the court's inquiry is limited to consideration of the ordinance on its face against the background of the government's objective and the prospect of the ordinance's general effect," *id.* at 1323, "without regard to [an ordinance's] impact on the plaintiff asserting the facial challenge," *Educ. Media Co. at Va. Tech, Inc. v. Swecker*, 602 F.3d 583, 588 (4th Cir. 2010). In this situation, however, the court neither undertook nor properly conducted a facial analysis of the constitutionality of the Ordinance.

In the First Amendment context, there are two ways for a plaintiff to mount a facial challenge to a statute. First, the plaintiff may demonstrate "that no set of circumstances exists under which the [law] would be valid, i.e., that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotation marks omitted). Or, second, the plaintiff may show that the law is "overbroad [because] a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (internal quotation marks omitted). Here, the district court did not conclude that the Ordinance is invalid in *all* its applications. For example, it never assessed the potential application of the Ordinance to limited-service pregnancy centers that charge a fee for their services. Indeed, the majority emphasizes instead the Ordinance's application to "the provision of 'free services.'" *Ante* at 30-31.[6]

The district court also failed to address "a substantial number" of the Ordinance's other applications. Put succinctly, its analysis was an as-applied one, focusing almost exclusively

---

[6]The majority also excludes from its analysis limited-service pregnancy centers that practice medicine or are staffed by licensed professionals. *See ante* at 32.

on the Ordinance's application to *the Center*. For example, on the question of whether the Ordinance regulates commercial or noncommercial speech, the court conducted an as-applied free speech analysis, amply demonstrated by its repeated (and inappropriate) *findings* on the specific characteristics of the Center:

- "The overall purpose of the advertisements, services, and information offered by *the CENTER* is not to propose a commercial transaction, nor is it related to *the CENTER's* economic interest." *O'Brien*, 768 F. Supp. 2d at 813 (emphasis added);

- "*The CENTER* engages in speech relating to abortion and birth-control based on strongly held religious and political beliefs rather than commercial interests or profit motives." *Id.* (emphasis added);

- "The notion that 'human life must be respected and protected absolutely from the moment of conception' is a central tenet of *the CENTER's* belief system." *Id.* (emphasis added);

- "[T]he disclaimer mandated by the Ordinance introduces the topics of abortion and birth-control. This has an immediate effect on any speech and information offered by *the CENTER* on these subjects." *Id.* at 814 (emphasis added); and

- "At the very least, a disclaimer conspicuous to anyone visiting *the CENTER* regarding the lack of abortion and birth-control services, mandates the inclusion of a government message concurrent, and intertwined with, Plaintiffs' delivery of

fully protected speech." *Id.* at 814 (emphasis added).

Similarly, in assessing whether the Ordinance is viewpoint neutral, the Opinion made what can only be deemed to be as-applied *findings*. More specifically, it related that:

- "*The CENTER's* viewpoint, formed on the basis of sensitive religious, moral, and political beliefs, is the overarching reason for its stark refusal to perform or refer for abortions and certain types of birth-control." *Id.* at 815 (emphasis added); and

- "It is revealing that Defendants refer to the Ordinance as a means of mitigating the 'harm' caused by *Plaintiffs'* underlying 'propaganda' speech relating to abortion and contraception. Such descriptions can only support the conclusion that Defendants enacted the Ordinance out of disagreement with *Plaintiffs'* viewpoints on abortion and birth-control." *Id.* at 816 (emphasis added).

The panel majority elaborates on several of these same factual points. *See ante* at 31, 32, 34, 36-37.

In dissenting, I cast no aspersions on the use of the as-applied approach in the proper setting. Indeed, it is clear that "[a]s-applied challenges," with specific factual records, "are the basic building blocks of constitutional adjudication." *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) (internal quotation marks omitted). For a variety of reasons, a court should entertain an as-applied constitutional challenge prior to assessing a facial one and, if the as-applied challenge succeeds, neither reach nor rule on the facial one. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501-02 (1985). As the Supreme Court has explained, "[f]acial challenges are disfavored" because they "often rest on speculation" and thus "raise the risk of premature interpretation of [laws] on the basis of factu-

ally barebones records." *Wash. State Grange*, 552 U.S. at 450 (internal quotation marks omitted). Moreover, a facial challenge may contravene "the principle of judicial restraint that courts should [not] formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (internal quotation marks omitted). As my friend Judge Niemeyer has emphasized, a facial challenge "must be treated cautiously . . . because slipping into the embrace of a facial challenge can tend to leave behind the limitations imposed by Article III and [thus] trample on legislative prerogatives, in violation of separation of powers principles." *Preston v. Leake*, 660 F.3d 726, 738 (4th Cir. 2011) (internal quotation marks omitted).

Because an as-applied analysis was employed by the district court in this case, the City was unquestionably entitled to conduct discovery proceedings. *See Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995) (Niemeyer, J.) (explaining that, when confronted with an as-applied challenge, a "court is given the task of finding the facts defining that circumstance and determining how the circumstance is impacted by the . . . enactment"), *vacated on other grounds*, 517 U.S. 1206 (1996). The district court acknowledged as much during its August 4, 2010 hearing on the parties' respective motions, when it recognized that discovery proceedings would be necessary to properly evaluate an as-applied challenge to the Ordinance. *See* J.A. 127-28, 130 (observing that "[the Center] can't prevail on [summary judgment] if I'm concerned about [its] individual status," and assuring that "if what [the Center] did is relevant in this case[, the City] will have the discovery").

Alternatively, discovery would be warranted if we were to "treat[ ] this as a true facial challenge, rather than . . . an as-applied challenge in the guise of a facial attack." *Cf. Martin v. Stewart*, 499 F.3d 360, 378 (4th Cir. 2007) (Wilkinson, J., dissenting). As the City points out, a facial challenge would "weigh[ ] in favor of discovery, not against it." Reply Br. of

Appellants 26. For example, "even if [the Center] did not engage in commercial transactions, it [would not necessarily] prevail on a facial challenge [even] if other [limited-service pregnancy centers] in Baltimore did," including those within the Ordinance's scope that charge fees. *Id.* at 26-27 & n.12. Thus, regardless of the type of analysis utilized — facial or as-applied — the district court abused its discretion by denying the City its right to conduct discovery.

2.

In declining to approve the City's discovery requests concerning the potential commercial nature of speech targeted by the Ordinance, the district court short-circuited the analysis that was essential to properly deciding the appropriate level of judicial scrutiny. That analysis should have been fact-driven, due to the inherent "difficulty of drawing bright lines that . . . clearly cabin commercial speech in a distinct category." *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993). The Supreme Court has long grappled with the concept of commercial speech, describing it at various times as speech "confined to the promotion of specific goods or services," *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 505 n.12 (1981), or "related solely to the economic interests of the speaker and its audience," *In re R.M.J.*, 455 U.S. 191, 204 n.17 (1982) (internal quotation marks omitted). More recently, the Court has explained that it "usually define[s]" commercial speech "as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001).[7] The proposition of a commercial transaction — "I will sell you the X . . . at the Y price," *see Va. State Bd. of Pharmacy v. Va. Citizens Consumer*

---

[7]Notably, we have recognized that, although "speech that proposes a commercial transaction" is "a fairly straightforward" definition of commercial speech, it is also "somewhat circular." *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 440 (4th Cir. 1999) (alteration and internal quotation marks omitted).

*Council, Inc.*, 425 U.S. 748, 761 (1976) — is the "core notion" of commercial speech. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983).

On the periphery, the distinction between commercial and noncommercial speech "presents a closer question." *Bolger*, 463 U.S. at 66. The Supreme Court has identified "three factors to consider in deciding whether speech is commercial: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008) (internal quotation marks omitted); *accord Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 441 (4th Cir. 1999). We have recognized that, although none of the factors is dispositive, "the confluence of these considerations may permit the conclusion that the speech at issue is commercial in nature." *Adventure Commc'ns*, 191 F.3d at 441.

a.

The speech targeted by the Ordinance indubitably satisfies the first two of the *Bolger* factors — i.e., advertisements referring to a service. The majority surmises, however, that the third factor is absent, because "there is no indication that the Pregnancy Center is motivated by any economic interest." *Ante* at 31. Ironically, my good colleagues fault the City for not addressing "what economic interest motivates the Pregnancy Center's speech," *id.*, while ratifying the district court's denial of the City's discovery requests that were aimed at, inter alia, obtaining such information. The majority simply accepts — as did the district court — the Center's assertion (by counsel only) that its motives are entirely religious or political. But that assertion — although quite material — was not at all undisputed. The City's discovery proceedings should have substantiated, inter alia, whether the Center possesses economic interests apart from its ideological motiva-

tions.[8] Such discovery is "especially important when the relevant facts are exclusively in the control of [the movant]" or "when a case involves complex factual questions about intent and motive." *See Harrods Ltd.*, 302 F.3d at 247.

In any event, the potential commercial nature of its speech does not hinge solely on whether the Center has an economic motive. Not all of the *Bolger* factors "must necessarily be present for speech to be commercial." *Bolger*, 463 U.S. at 67 n.14. Because the Ordinance compels a disclaimer, a court's "lodestars" in distinguishing commercial from noncommercial speech are the "nature of the speech" regulated by the Ordinance "taken as a whole and the effect of the compelled [disclaimer] thereon." *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). In other words, context matters. From a First Amendment free speech perspective, that context includes the viewpoint of the listener, for "[c]ommercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the

---

[8]Inquiring into the Center's potential profit motives may not be a futile endeavor. We know that nonprofit entities with religious or political motives can engage in commerce. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 573 (1997) (summer camp sponsored by Christian Science nonprofit substantially affected interstate commerce though camp was not profitable and indeed at times operated on deficit); *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 541 (4th Cir. 1998) (nonprofit land preservation organization's acceptance of land donation "was commercial"). And, although outwardly the Center appears to be driven by religious purposes only, certain operational intricacies may prove otherwise. For instance, as observed in a similar case, if the Center were "referring women to pro-life doctors in exchange for 'charitable' contributions, the analysis could change." *Evergreen Ass'n, Inc. v. City of N.Y.*, 801 F. Supp. 2d 197, 206 n.5 (S.D.N.Y. 2011). There was "no such evidence" of referrals in exchange for charitable contributions in *Evergreen Association*, but there the parties had an opportunity to conduct discovery. *Id.* Here, the prospect that such evidence exists is not so farfetched. According to certain of the amici curiae — national organizations that network individual pregnancy care centers ("Amici PCCs") — all of their affiliated centers "make referrals to prenatal care providers for their patients who are pregnant." Br. of Amici PCCs 7.

societal interest in the fullest possible dissemination of information." *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 561-62, 567 (1980) (evaluating commercial nature of regulated speech based in part on impact to consumers of electricity); Robert Post, *The Constitutional Status of Commercial Speech*, 48 UCLA L. Rev. 1, 14 (2000) (observing that "[t]he Court has . . . focused its analysis on the need to receive information, rather than on the rights of the speakers").

The Supreme Court of North Dakota's decision in *Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176 (N.D. 1986), *cert. denied*, 476 U.S. 1108 (1986), illustrates the proper contextual analysis. The *Larson* case involved false and deceptive advertising by the Help Clinic, which, like the Center, provided pregnancy tests and anti-abortion counseling services to its clients at no cost. In determining that the Help Clinic's advertising constituted commercial speech, the *Larson* court concluded that the provision of free services was not "dispositive." 381 N.W.2d at 181. Rather, the court emphasized that

> the Help Clinic's advertisements are placed in a commercial context and are directed at the providing of services rather than toward an exchange of ideas . . . . In effect, the Help Clinic's advertisements constitute promotional advertising of services through which patronage of the clinic is solicited, and in that respect constitute classic examples of commercial speech.

*Id.*

We are unable to properly assess the context of any speech regulated by the Ordinance "because no record evidence of [the Center's] advertisements exists to guide our review, [thus] we can only speculate about the ways in which the [Ordinance] might be applied to [the Center's] speech." *See*

*Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324, 1344-45 (2010) (Thomas, J., concurring in part) (observing that neither as-applied nor facial challenges could be reviewed properly where there was no evidence of subject advertisements). Nor is there any evidence concerning the Ordinance's impact on consumers of such information. In ruling as it did, the district court was unconcerned with the full context, because it decided that, even if the Center's speech "includes some commercial elements, strict scrutiny would nonetheless apply," since any commercial element was "'inextricably intertwined with otherwise fully protected speech.'" *O'Brien*, 768 F. Supp. 2d at 814 (quoting *Riley*, 487 U.S. at 796).

b.

In my view, it was legally erroneous for the district court to conclude, without the benefit of discovery, that the speech at issue blends commercial and noncommercial elements. The court necessarily premised that conclusion on its own finding that the "dialogue between a limited-service pregnancy center and an expectant mother begins when the client or prospective client enters the waiting room of the center." *O'Brien*, 768 F. Supp. 2d at 814. But such a dialogue may actually begin much earlier, when a prospective client views a limited-service pregnancy center's advertisements. Indeed, the purpose of the Ordinance was to curb any deceptive advertising. Even if the disclaimer in the waiting room were the "initial communication," however, the court mischaracterized the disclaimer as "a stark and immediate statement about abortion and birth-control." *Id.* The disclaimer does not, as the majority suggests, convey a message that abortion and birth control are "morally acceptable alternative[s]." *Ante* at 28. The disclaimer simply does not speak to what is or may be morally acceptable. It merely discloses that a particular pregnancy center does not provide or refer for abortions or nondirective and comprehensive birth-control services. That is, the dis-

claimer relates to the services offered, not to the religious or ideological beliefs of a pregnancy center.

Moreover, "where the two components of speech can be easily separated, they are not 'inextricably intertwined.'" *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989)). Because the Ordinance merely requires a disclosure that "the center does not provide or make referrals for abortion or birth-control services" — but does not otherwise prescribe the language or terminology to be used — a limited-service pregnancy center could disassociate itself completely from the required disclaimer. Indeed, a limited-service pregnancy center would be free to express its disapproval alongside the disclaimer, or otherwise qualify its viewpoint vis-à-vis the disclaimer.[9] More to the point, however, "[n]othing in the [Ordinance] prevents [a pregnancy center] from conveying, or the audience from hearing, . . . noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages." *See Fox*, 492 U.S. at 474; *see also Fargo*, 381 N.W.2d at 181 (concluding it was unnecessary to extend First Amendment protections to the clinic's "commercial solicitation of clientele" because the clinic could "advocat[e] . . . outside the commercial context

---

[9]Notably, had the City been permitted to conduct discovery, it could have shown that the Center's website already provides a disclaimer explaining its position: "Our mission is to protect the physical, emotional and spiritual lives of women and their unborn children. We do not perform or refer for abortions because of the physical and emotional risks involved." Center For Pregnancy Concerns, http://www.cpcforhelp.org (last visited June 19, 2012). The existence of such a disclaimer featured conspicuously on the website contradicts the assertion of the Center's "representative," referenced by the majority, that "the Pregnancy Center would not speak to clients and potential clients in the manner required by the ordinance." *Ante* at 28. Furthermore, Amici PCCs inform us that they counsel their affiliates to disclose that they do not offer or refer for abortions and, in their advertisements, to "avoid implying that abortion services or professional counseling is available." *See* Br. of Amici PCCs 9, 21-22.

and receive full First Amendment protection"). Put simply, the Ordinance does not prohibit or restrict a limited-service pregnancy center's speech about abortion and birth-control.

In sum, the district court's finding that the Ordinance targeted noncommercial speech or, at most, intertwined commercial and noncommercial speech — as echoed by the majority — was premature and inappropriate. Under the applicable rules of procedure and our precedent, it was essential to the City's opposition to the Center's summary judgment motion — and to a fair and proper exercise of judicial scrutiny — for the court to have the benefit of discovery. *See, e.g.*, *Gay*, 761 F.2d at 177; Fed. R. Civ. P. 12(d) (providing reasonable opportunity for discovery after conversion of Rule 12(b)(6) motion to summary judgment motion). Those discovery proceedings should have yielded, inter alia, any economic motivations of the Center, the context of the Center's advertisements in relation to the disclaimer, and the degree of entanglement, if any, of the commercial and noncommercial elements of the regulated speech.[10]

---

[10]Although not addressed by the district court, and raised only indirectly by the City on appeal, there may well be a legitimate question as to whether the speech targeted by the Ordinance constitutes professional speech. The majority dismisses that possibility because "the pregnancy centers that are subject to Ordinance 09-252 do not practice medicine, are not staffed by licensed professionals, and need not satisfy the informed consent requirement." *Ante* at 32. I am simply unable to understand how the majority can make such factual findings. In truth, there may be licensed professionals who are subject to the Ordinance. Indeed, Amici PCCs assert that some of its affiliates "operate under the licensure of a physician-medical director [and] provide medical services . . . by certified and licensed professionals," and that "there are 750 such clinics nationwide, including [the Center]." Br. of Amici PCCs 6-7. Therefore, discovery concerning the possible professional nature of the regulated speech is also warranted.

3.

In rejecting the City's right to conduct discovery proceedings regarding the compelling interests advanced by the Ordinance, the district court improperly characterized the City's request as solely "an attempt to generate justifications for the Ordinance following its enactment." *O'Brien*, 786 F. Supp. 2d at 810. The court relied on the Supreme Court's decision in *United States v. Virginia*, 518 U.S. 515, 533 (1996), for the proposition that the City's justification should not be "invented post-hoc in response to litigation." The City, however, sought only to augment the record with evidence to support its existing justification — not to invent a new one. As we have previously observed, "courts have routinely admitted evidence . . . to supplement a legislative record or explain the stated interests behind challenged regulations." *11126 Balt. Blvd. v. Prince George's Cnty., Md.*, 886 F.2d 1415, 1425 (4th Cir. 1989), *vacated on other grounds*, 496 U.S. 901 (1990). Although "'supplemental' materials cannot sustain regulations where there is *no* evidence in the preenactment legislative record[, that] is not the case here." *Id.*

The majority does not deny that there was a substantial pre-enactment record supporting adoption of the Ordinance; rather, my colleagues simply deem that record insufficient to establish a compelling interest. *See Ante* at 36 (observing that "the record establishes, at most, only isolated instances of misconduct by pregnancy centers generally" and "the record contains no evidence that any woman has been misled into believing that any pregnancy center . . . was a medical clinic or that a woman in Baltimore delayed seeking medical services because of such a misconception"). But criticizing the record as somehow lacking merely begs the real question underlying the errors of the district court: Why was the City denied a full and fair opportunity to conduct discovery and present a proper record?

As Judge Niemeyer recently explained, "the Constitution does not mandate a specific method by which the government

must satisfy its burden under heightened judicial scrutiny. . . . [I]t may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require." *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (remanding "to allow the government to develop a record sufficient to justify its argument" concerning interests advanced by statute). And, when the court's record is deficient, the government has been permitted to marshal the relevant evidence. *See, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 668 (1994) (remanding "to permit the parties to develop a more thorough factual record" because government had failed to demonstrate "that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way"); *see also Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 215 (4th Cir. 1993) (indicating that remand for discovery would be warranted had the "City . . . asked the district court for additional discovery to respond to . . . summary judgment, or for additional time to 'develop the factual record' in support of its alleged compelling state interest"). We have no discernible reason to stray from such precedent.

B.

Apart from abusing its discretion by denying the City of Baltimore its right to conduct discovery, the district court also erred in concluding that the Ordinance is not viewpoint neutral — its alternative basis for applying strict scrutiny. *See O'Brien*, 768 F. Supp. 2d at 815-16. The majority endorses that conclusion by way of footnote only, agreeing that, because the Ordinance applies solely to persons who do not provide or refer for abortions or nondirective and comprehensive birth-control services, it burdens only "pro-life speakers," "whose moral or religious codes lead them to oppose abortion and birth control." *Ante* at 34 n.4. It requires no lengthy deliberation to specify examples that entirely undermine the majority's supposition:

- A Lamaze instructor, who teaches pregnant women and their partners strategies for having a natural, healthy pregnancy and childbirth, may not provide referrals for abortion or birth-control services simply because that is not the objective of her job;

- A doula, who gives advice and emotional assistance to pregnant women during childbirth, would have no cause to even discuss abortion or birth-control, much less make referrals;

- A pregnancy shelter, supplying material assistance and information about pregnancy-related products, may not make referrals for abortion or nondirective and comprehensive birth-control services so as to avoid liability because it has no licensed or trained professionals to address those subjects; and

- A center, encouraging or facilitating adoption services or surrogate pregnancies, may be neither qualified nor disposed to make referrals for abortion or birth-control services.[11]

---

[11]The foregoing examples are more appropriate than the district court's effort, made during its hearing on the parties' respective motions, to compare the Ordinance to a regulation requiring "a non-American car dealership . . . to post a sign that says, 'We do not offer cars built in the United States.'" J.A. 131. The court posed the hypothetical dealership regulation to suggest that in the same way that "BMW salespeople would . . . be handicapped by having their customers read the sign that they don't want their customers to think about that issue," the Ordinance disfavors the Center because when a woman "comes in and [the Center] says we don't offer abortions" the woman thinks, "Oh, abortions, yeah, I guess I better ask about that." *Id.* The court thus remarked the Ordinance is "not neutral." *Id.* Comparing a woman's right to seek lawful medical treatment to a salesperson's economic interest in keeping his customers ignorant is, as the court initially thought before it made the comparison anyway, "a stupid example." *Id.*

Absent the premise that the Ordinance burdens only pro-life speakers, the majority's fallback position is legislative history, which, it asserts, demonstrates that the Ordinance was enacted because of an improper animus of the City Council against the Center's viewpoint on abortion and birth-control. As the majority points out, however, the City "has referred and continues to refer women to the Pregnancy Center." *Ante* at 37. If the City disfavors the Center's viewpoint, or possesses an improper animus against the Center, its continual referrals of women to the Center constitutes an unexplained oddity. In any event, the record validates the City's uncontradicted contention that the Ordinance was enacted to curtail deceptive advertising, not because the City disagreed with or wanted to suppress the Center's speech.[12] And the majority has failed to identify any aspects of the record that show otherwise. If there were some ambiguity, however, that would be more reason to conduct full discovery.[13]

C.

Even if all I have said to this point misses the mark, the district court's award of summary judgment to the Center must nevertheless be vacated. Put simply, there are genuine disputes of material fact regarding the issues of compelling interests and narrow tailoring that must be assessed.

---

[12] As explained in Part I.A *supra*, the City Council acted carefully and prudently in its adoption of the Ordinance. Even on this limited record, the evidence supports its action, and the record shows that the Council secured and relied on the advice of counsel. That record, which must be viewed in the light most favorable to the City, fatally undermines any assertion of improper animus against the Center or other limited-service pregnancy centers. Indeed, the record shows conclusively that the animus assertion has been created from whole cloth.

[13] Notably, the need for discovery was evident in the Opinion's description of the legislative record as "uneven when demonstrating the depth and severity of the problem relating to limited-service pregnancy centers and deceptive advertising." *O'Brien*, 768 F. Supp. 2d at 816.

## 1.

Although the district court assumed that the Ordinance serves a compelling interest, the majority disparages the two such interests espoused by the City: (1) an "interest in protecting the public from ongoing deceptive business practices"; and (2) a "public health interest in ensuring that individuals who seek abortion or comprehensive birth-control services have prompt access to those services." Br. of Appellants 35-36. In addition to criticizing the incompleteness of the pre-enactment record — which, as previously explained, would be readily remedied with discovery — the majority "question[s] [the City's] selective pursuit of its interest." *Ante* at 36. My fine colleagues protest in their majority opinion that the City is not actually interested in combating inaccurate information about pregnancy services, because the Ordinance does not regulate "the vast majority of sources that pregnant women would likely consult." *Id.*

The City, however, had an obligation to deal with existing public health problems, without addressing the likelihood of deception from every possible source of information available to pregnant women. *See Buckley v. Valeo*, 424 U.S. 1, 105 (1976) (observing that a "statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind" (citations and internal quotation marks omitted)). The majority persists, however, that the City could have posted a "notice," placed a "warning on its own website," or provided "public service information," rather than target a pregnancy center's speech, if it were really interested in combating deceptive practices. *Ante* at 37. But such criticisms by unelected judges are more a critique on the particular means of serving the City's compelling interests, discussed *infra*, than a valid argument that those interests are not compelling.

In any event, the majority's criticisms are lodged against the City's first identified compelling interest, with no more than a nod to the second. The City undoubtedly possesses a compelling interest in defending a woman's right to obtain timely information and medical care in connection with her pregnancy. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 767 (1994) (agreeing that Florida had a "strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy"). Indeed, the City filed the Blum declaration to further substantiate that very interest. *See* J.A. 44. Dr. Blum therein explained that public health is advanced by providing complete and accurate information to women about their health care options because, inter alia:

- "The evidence is crystal clear that family planning is one of the best strategies for women in the United States . . . to improve their health and well-being, as well as that of their offspring." *Id.* at 45;

- "Women who can plan the number and timing of their births experience fewer unwanted pregnancies and births and have lower rates of abortion." *Id.*; and

- "Certain people are particularly vulnerable to being deceived by limited-service pregnancy centers that fail to disclose the scope of services that they provide. Those people include adolescents and those who are poor or otherwise marginalized in society." *Id.* at 46.

Notwithstanding the foregoing, the Blum declaration — which is uncontroverted — was never referenced by the district court. And, because this is an appeal from summary judgment, the Blum declaration must be viewed in the light most favorable to the City. *See Kubicko v. Ogden Logistics Servs.*,

181 F.3d 544, 551 (4th Cir. 1999) (observing that, in reviewing the propriety of summary judgment, an appellate court considers "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences from the affidavits . . . submitted below in his or her favor"). Dr. Blum's evidence alone was more than sufficient to create a genuine dispute of material fact on the compelling interest requirement. *Cf. TFWS, Inc. v. Shaefer*, 325 F.3d 234, 241-42 (4th Cir. 2003) (vacating summary judgment award because non-moving party proffered expert reports demonstrating genuine disputes of material fact); *McTernan v. City of York, Pa.*, 564 F.3d 636, 651 (3d Cir. 2009) (concluding factual disputes concerning city's compelling interests barred summary judgment).

2.

Both the district court and the panel majority described the lack of narrow tailoring as the Ordinance's "fatal" constitutional defect. *See ante* at 37; *O'Brien*, 768 F. Supp. 2d at 817. On this record, however, such a conclusion simply cannot be sustained.

a.

Notwithstanding all the controversy and litigation this Ordinance has engendered, we must be mindful that we are dealing with a one-sentence, non-verbal, truthful disclaimer posted on a sign in a waiting room. The Ordinance does not otherwise prohibit or inhibit a limited-service pregnancy center's speech. Indeed, the Ordinance is so minimally burdensome that the majority condemns it as underinclusive — failing "to regulate 'deceptive practices' or false advertising," the City's first identified compelling interest. *Ante* at 38.

The courts have consistently recognized, however, that, when confronted with false or misleading advertising, "the preferred remedy is more disclosure, rather than less." *See*

*Bates v. State Bar of Ariz.*, 433 U.S. 350, 375 (1977); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) (observing that a "disclaimer might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception" (alteration and internal quotation marks omitted)). As we have explained, "[d]isclosure laws perform the important function of deterring actual corruption and avoiding the appearance of corruption, but unlike other types of restrictive laws," disclosures have the added advantage of promoting "speech by making more information available to the public and thereby bolstering the 'marketplace of ideas.'" *Master Printers of Am. v. Donovan*, 751 F.2d 700, 710 (4th Cir. 1984). Nevertheless, to go further than a simple waiting room sign — by, for example, legislating precisely what a limited-service pregnancy center must say in an advertisement — could "chase [the City] into overbroad restraints of speech." *Cf. Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331, 345-46 (4th Cir. 2005).

b.

In the same vein that it condemns the Ordinance as *under*inclusive, the majority maintains that the disclaimer is *over*inclusive because "it applies equally to pregnancy centers that engage in deceptive practices and those whose speech is entirely truthful." *Ante* at 38. But the Ordinance applies equally to all limited-service pregnancy centers, due to the inherent potential for consumer confusion and deception concerning the services provided. *Cf. Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982) (rejecting contention that statute likely applicable to violators and nonviolators alike was overinclusive because it aimed "to prevent both actual and apparent corruption" and "it is the potential for such influence that demands regulation"). In that regard, exempting certain limited-service pregnancy centers could undermine "the efficacy of [the Ordinance's] overall scheme." *See Am. Legion Post 7 of Durham, N.C. v. City of Durham*, 239 F.3d 601, 610 (4th Cir. 2001) (deeming ordi-

nance applicable to commercial and noncommercial entities as nevertheless narrowly tailored); *cf. Borgner v. Brooks*, 284 F.3d 1204, 1214 (11th Cir. 2002) (concluding that disclaimer constituted "constitutional alternative, one which is less restrictive, yet sufficient to cure the potential deception and ultimately serving the state's interest").

c.

Finally, my good colleagues of the majority suggest that the Ordinance is not the least restrictive means of preventing deceptive advertising by limited-service pregnancy centers. They insist that the City could have undertaken a public education campaign to raise awareness, that it could have distributed information or operated a website about the services offered by such pregnancy centers, or that it simply could have prosecuted offenders of deceptive advertising laws. Pursuant to Supreme Court precedent, "[w]hen a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000). Put simply, however, the City has never been accorded a meaningful opportunity to satisfy that burden. The Center did not, until it replied concerning its own summary judgment request, propose any less restrictive alternatives. Thereafter, the district court denied the City its right to conduct discovery and awarded summary judgment to the Center. In so doing, the court suggested other less restrictive alternatives. Of course, the City has argued — in both the district court and on appeal — that these alternatives would be ineffectual or less effective. Importantly, however, the City has never had a chance to adduce evidence with respect to those alternatives.

At the very least, however, the City has identified a genuine dispute of material fact on the narrow tailoring requirement. The Ordinance requires only the disclaimer, which is critical

to the analysis. As the Supreme Court has most recently again emphasized, a "disclosure is a less restrictive alternative to more comprehensive regulations of speech." *See Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 915 (2010). Moreover, "the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed." *Zauderer*, 471 U.S. at 651 n.14 (1985) (observing that "disclosure requirements trench much more narrowly . . . than do flat prohibitions on speech"). Public education campaigns and websites may be successful to some degree, but they do not ensure that every woman who visits a limited-service pregnancy center will be apprised of the services offered there, at a time when such information is most needed. Inadequate or unenforceable deceptive advertising statutes, problems of proof, and scarcity of resources can also impact efforts to prosecute limited-service pregnancy centers. It is worth reiterating that the least restrictive alternatives must be "*as effective* in achieving the [Ordinance's] legitimate purpose." *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 846 (1997) (emphasis added).

Summary judgment is never appropriate where, as here, there are genuine disputes of material fact on the narrow tailoring requirement. *See, e.g.*, *Snell v. City of York, Pa.*, 564 F.3d 659, 669-70 (3d Cir. 2009) (identifying factual issues regarding whether police officer's restrictions against protester were narrowly tailored to meet government's compelling interests); *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 989 (9th Cir. 2008) (holding that the court erred in awarding summary judgment "[b]ecause disputed issues of material fact exist as to whether the policy of prohibiting group worship by maximum security prisoners is the least restrictive means of maintaining security"); *729, Inc. v. Kenton Cnty. Fiscal Court*, 515 F.3d 485, 504-05 (6th Cir. 2008) (vacating summary judgment award where factual issues were apparent on whether ordinance regulating sexually oriented businesses was narrowly tailored); *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1395 (D.C. Cir. 1990) (remanding for

development of factual issues concerning whether regulation was sufficiently narrowly tailored to survive First Amendment scrutiny).

### III.

Because the district court erred in denying discovery to the City, and in awarding summary judgment to the Center in the face of genuine disputes of material fact, I would vacate the judgment and remand for such further proceedings as may be appropriate.

In these circumstances, I respectfully dissent.